**FREEPORT–McMORAN RESOURCE PARTNERS LIMITED PARTNERSHIP, a Delaware limited partnership, through its Agrico Chemical Company, Division, Plaintiff,**

v.

**B–B PAINT CORPORATION, Bradford White Corporation, Brunswick Corporation, Burwood, Chemical Recovery Systems, Inc., Chemetron, Ciba Specialty Chemicals Corporation, Leonard Coraci, Crown Enameling Prod-**

ucts, Eagle Ottawa, Fessler Borman, Flint Park & Recreational, William Greenway, Hastings Manufacturing, International Harvester, Keeler Brass Company, Knape & Vogt Manufacturing Company, Lear Siegler, Lescoa, Motor Products, Nordco, Prein & Newhof, Rospatch Label, Rowe International, Knoll, Inc., Stow Davis, United Steel, U.S. Chemical Co., Inc., and Upjohn Company, Defendants.

No. Civ.A. 96–40451.

United States District Court,
E.D. Michigan,
Southern Division.

July 16, 1999.

Patrick G. Seyferth, Feeney, Kellett, Bloomfield Hills, MI, James P. Feeney, Bloomfield Hills, MI, for Freeport–McMoran Resource Partners Limited Partnership, plaintiff.

Frederick L. Schmoll, III, Kevin A. Lavalle, Michael W. Edmunds, Gault, Davison, Flint, MI, for B and B Paint, Barrels, Inc., defendants.

Michael F. Kelly, Mark M. Davis, Varnum, Riddering, Grand Rapids, MI, Philip A. Grashoff, Jr., Varnum, Riddering, Grand Rapids, MI, for Bradford White, Brunswick, Keeler Brass, defendants.

Charles E. Barbieri, Foster, Swift, Lansing, MI, for Burwood, Chemical Recovery, defendants.

Stephen T. Moffett, Moffett & Dillon, Birmingham, MI, Diane T. Gorczyca, Cardelli, Herbert, Royal Oak, MI, Joseph R. Brendel, Thorp, Reed, Pittsburgh, PA, for Chemretron, defendant.

John D. Tully, John V. Byl, Warner, Norcross, Grand Rapids, MI, for Eagle Ottawa, Hasting Manufacturers, defendants.

Susan J. Tarrant, Saginaw, MI, for Fessler Bowman, defendant.

Loyst Fletcher, Jr., Flint, MI, for Flint Park and Recreational, defendant.

Nicholas G. Zotos, Dykema, Gossett, Detroit, MI, Ilyse W. Schuman, Chicago, IL, for International Harvestor, defendant.

Michael F. Kelly, Mark M. Davis, Varnum, Riddering, Grand Rapids, MI, Philip A. Grashoff, Jr., Varnum, Riddering, Grand Rapids, MI, Christopher D. Harrington, Grand Rapids, MI, for Knape and Vogt, Bofors Noble, Inc., defendants.

Richard A. Sundquist, Cross Wrock, Detroit, MI, for Lear Siegler, defendant.

Michael F. Kelly, Mark M. Davis, Varnum, Riddering, Grand Rapids, MI, for Lescoa, Major Oil, Miller Metals, Rospatch Label, defendants.

Barbara E. Buchanan, Thomas P. Wilczak, Pepper, Hamilton, Detroit, MI, for Motor Prod., M.W.A., Nordco, Organic Chemical, defendants.

Drew F. Seaman, Straub, Seaman, St. Joseph, MI, for Prein and Newhof, R.C. Allen, defendants.

R. Howard Grubbs, Womble, Carlyle, Winston–Salem, NC, for Ren Plastics, defendant.

Jon R. Muth, Daniel P. Perk, Miller, Johnson, Grand Rapids, MI, for Rowe International, Royal Casket, Shaw Walker, Upjohn Co., defendants.

Christopher J. Dunsky, Honigman, Miller, Detroit, MI, for Stow Davis, Thrall Oil, defendants.

John G. Gleeson, Strobl & Borda, Bloomfield Hills, MI, Michael V. Sucaet, Vestevich, Mallender, Bloomfield Hills, MI, William P. Greenway, Regulatory Law Services, Washington, MI, for U.S. Chemical, defendant.

Raymond C. Schultz, Kreis, Enderle, Kalamazoo, MI, for United Steel, defendant.

Michael V. Sucaet, Vestevich, Mallender, Bloomfield Hills, MI, for William Greenway, Leonard Coraci, movants.

**MEMORANDUM OPINION AND ORDER (1) GRANTING CERTAIN DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF EUGENE MEYER, (2) DENYING AS MOOT DEFENDANT PHARMACIA & UPJOHN COMPANY'S MOTION TO DISQUALIFY EUGENE MEYER, PH.D. FROM TESTIFYING AGAINST DEFENDANT PHARMACIA & UPJOHN COMPANY, (3) DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, (4) GRANTING CERTAIN DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT, (5) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WILLIAM GREENWAY, (6) GRANTING DEFENDANT WILLIAM GREENWAY'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND (7) GRANTING DEFENDANT B–B PAINT CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

GADOLA, District Judge.

## I. INTRODUCTION

The above-entitled case is an action for contribution for environmental clean-up costs brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), §§ 101–405, as amended, 42 U.S.C. §§ 9601–9675 and Michigan's Natural Resources and Environmental Protection Act (NREPA), M.C.L. § 324.3101 *et seq.*

On August 27, 1998, plaintiff Freeport–McMoran Resource Partners Limited Partnership (hereinafter "Freeport") filed a motion for partial summary judgment against 15 defendants.[1] These 15 defendants are as follows: (1) B–B Paint Corporation, (2) Bradford White Corporation, (3) Brunswick Corporation, (4) Chemical Recovery Systems Inc., (5) Chemetron Corporation, (6) Ciba Specialty Chemicals Corporation, (7) Eagle Ottowa Leather Company, (8) International Harvester/Navistar, (9) Keeler Brass Company, (10) Knape & Vogt Manufacturing Company, Inc., (11) Knoll, Inc./Shaw Walker, (12) Motor Products–Owosso Corporation, (13) Rowe International, (14) U.S. Chemical Co., Inc., and (15) Pharmacia & Upjohn Co. *See* Plaintiff's Motion for Partial Summary Judgment, p. 2, n. 2.

Discovery, however, was not scheduled to end until December 15, 1998. As a consequence, certain defendants filed a motion on September 8, 1998, seeking to hold plaintiff's motion for partial summary judgment in abeyance pending completion of discovery.[2] In an order issued September 11, 1998, this Court granted certain defendants' motion to hold plaintiff's motion in abeyance and also set a new deadline for close of discovery and for the filing of certain defendants' response to the instant motion. On February 18, 1999, these defendants filed a 104 page brief in opposition to plaintiff's motion for partial summary judgment. On March 18, 1999,

1. Plaintiff Freeport–McMoran Resource Partners Limited Partnership apparently changed its name at some point after initiating the instant litigation. Its name appears to have changed to "Phosphate Resource Partners Limited Partnership." Despite this change in name, plaintiff will be herein referred to as "Freeport," so as to avoid confusion.

2. These "certain defendants" are as follows: (1) Bradford White Corporation, (2) Brunswick Corporation, (3) Chemetron Corporation, (4) Ciba Specialty Chemicals Corporation, (5) Eagle Ottowa Leather Company, (6) International Harvester/Navistar, (7) Keeler Brass Company, (8) Knape & Vogt Manufacturing Company, Inc., (9) Knoll, Inc./Shaw Walker, (10) Motor Products–Owosso Corporation, (11) Pharmacia & Upjohn, and (12) Rowe International.

plaintiffs filed their reply to certain defendants' response brief.[3]

The following *12* defendants have responded *as a group* to plaintiff's motion for partial summary judgment. These 12 have also requested that their response be treated as a cross motion for summary judgment. These 12 (hereinafter "certain defendants") are as follows:· (1) Bradford White Corporation, (2) Brunswick Corporation, (3) Chemetron Corporation, (4) Ciba Specialty Chemicals Corporation, (5) Eagle Ottowa Leather Company, (6) International Harvester/Navistar, (7) Keeler Brass Company, (8) Knape & Vogt Manufacturing Company, Inc., (9) Knoll, Inc./ Shaw Walker, (10) Motor Products–Owosso Corporation, (11) Pharmacia & Upjohn, and (12) Rowe International. On January 29, 1999, defendant U.S. Chemical joined in certain defendants' response to plaintiff's motion for partial summary judgment.

Currently pending before this Court are seven motions. All motions are interrelated and may be divided into two groups. The first group consists of two motions and concerns requests to disallow the expert testimony of Eugene Meyer, to wit: (1) certain defendants' motion to exclude expert opinions of Eugene Meyer, and (2) defendant Pharmacia & Upjohn Company's motion to disqualify Eugene Meyer, Ph.D. from testifying against defendant Pharmacia & Upjohn Company.

The second group consists of motions by both parties seeking either summary judgment or partial summary judgment, to wit: (3) plaintiff's motion for partial summary judgment, (4) certain defendants' cross motion for summary judgment, (5) plaintiff's motion for partial summary judgment against defendant William Greenway, (6) defendant William Greenway's motion for partial summary judgment, and (7) defendant B–B Paint Corporation's motion for summary judgment.

Oral argument on these seven motions was heard May 18, 1999. At the hearing, the parties stipulated on the record in open court that the following are the *only* parties still remaining in the instant case:

(1) B–B Paint Corporation

(2) Bradford White Corporation

(3) Brunswick Corporation

(4) Chemical Recovery Systems Inc.

(5) Chemetron Corporation

(6) Ciba Specialty Chemicals Corporation

(7) Eagle Ottowa Leather Company

(8) International Harvester/Navistar

(9) Keeler Brass Company

(10) Knape & Vogt Manufacturing Company, Inc.

(11) Knoll, Inc./Shaw Walker

(12) Motor Products–Owosso Corporation

(13) Rowe International

(14) U.S. Chemical Co., Inc. and

(15) Pharmacia & Upjohn Co.

(16) William Greenway, individually

Since the motions relating to the disqualification of proposed expert Eugene Meyer impact issues addressed in the parties' summary judgment motions, the Court will address the motions relating to expert testimony *first*, before embarking upon a discussion of the summary judgment motions.

For the reasons stated hereinbelow, the Court will grant certain defendants' motion to exclude expert opinions of Eugene Meyer, deny as moot defendant Pharmacia & Upjohn Company's motion to disqualify Eugene Meyer, Ph.D. from testifying against defendant Pharmacia & Upjohn Company, deny in part and grant in part

---

**3.** The responding defendants have filed their own cross motion for summary judgment. These defendants' 104 page responsive brief filed February 18, 1999 also serves as a brief in support of their cross motion. Likewise, plaintiff's reply brief filed March 18, 1999 serves both as its reply to certain defendants' response and as its response to certain defendants' cross motion.

plaintiff's motion for partial summary judgment, grant certain defendants' cross motion for summary judgment, deny plaintiff's motion for partial summary judgment against defendant William Greenway, grant defendant William Greenway's motion for partial summary judgment, and grant defendant B–B Paint Corporation's motion for summary judgment.

## II. FACTUAL BACKGROUND GERMANE TO ALL PENDING MOTIONS

### A. THE FOREST WASTE SITE

Plaintiff seeks contribution for costs incurred while conducting response actions at a hazardous waste disposal site near Otisville, Michigan. The site, known as the "Forest Waste Site," is located in Forest Township, Genesee County, Michigan and consists of approximately 110 acres of real property. The operating portion of the site is composed of lagoons which receive bulk liquids and a landfill consisting of approximately 11 acres. *See* Exh. 1 to Plaintiff's Brief in Support of Motion for Partial Summary Judgment (hereinafter "Plaintiff's Brief") ¶ 3.

It appears undisputed that the Forest Waste Site was licensed to accept, and did accept, general refuse, municipal and industrial liquid waste, organic and inorganic hazardous waste, as well as industrial sludge waste from December 10, 1973 through September 1, 1978. *See* Exh. 1 to Plaintiff's Brief.

At dispute are events which allegedly occurred during the period beginning January 30, 1975 through July 19, 1975. During that span of time, the Forest Waste Site allegedly received and accepted drummed waste containing hazardous substances from Berlin & Farro Liquid Incinerators (hereinafter "Berlin & Farro"). The drummed waste from Berlin & Farro was purportedly disposed of in the landfill area of the Forest Waste Site. *See* Exhs. 1, 2, 5, and 6 to Plaintiff's Brief.

In 1982, the Environmental Protection Agency (EPA) placed the Forest Waste Site on the National Priorities List because of releases of hazardous substances on the site. EPA subsequently ordered response actions for the clean-up of the Forest Waste Site. *See* Exhs. 1 and 2 to Plaintiff's Brief.

After issuance of the EPA order, a Forest Waste Coordinating Committee was formed by various companies which voluntarily organized to undertake investigative and remedial actions at the Forest Waste Site. *See* Exh. 1 to Plaintiff's Brief ¶ 6. None of the defendants in the above-captioned case is a member of the Forest Waste Coordinating Committee.

Plaintiff admits that it participated in the landfill remediation activities of the Forest Waste Site due to the fact that plaintiff caused waste to be disposed at the site, specifically, the debris from a warehouse fire. According to plaintiff, this waste was placed in the landfill and not in the lagoons of the Forest Waste Site. *See* Exh. 1 to Plaintiff's Brief ¶ 7.

With respect to the landfill portion of the Forest Waste Site, response actions have included excavation and offsite treatment of soil and drums, the installation of an RCRA cap, installation of a soil-bentonite slurry wall, installation and maintenance of a dewatering system, and installation of groundwater monitoring wells. *See* Exhs. 1 ¶ 8 and Exh. 2 to Plaintiff's Brief. According to plaintiff, to date the response costs relating to the landfill portion of the site have totaled more than $10 million, of which plaintiff has paid $2.3 million. *See* Exhs. 1 ¶ 9 to Plaintiff's Brief.

Plaintiff alleges that sampling and testing of the drums, soil and groundwater in the landfill area where the drummed waste was buried at the site in question reveals that the following hazardous substances, among others, are present: acetone, benzene, cadmium, chromium, copper, cyanide, ethylbenzene, lead, methyl isobutyl ketone, methyl ethyl ketone, methylene chloride, napthalene, nickel, potassium, sodium,

1,1,1–trichloroethane, tetrachloroethene, toluene, total xylenes, trichloroethene and zinc. *See* Exh. 1 ¶ 10 to Plaintiff's Brief.

Plaintiff has produced evidence that during the period that the Forest Waste Site was in operation, it received at least 13,638 drums of waste from *all* sources. Of this total, according to plaintiff, at least 12,297 drums of waste were transhipped from or shipped by Berlin & Farro during the period January 30, 1975 through July 19, 1975. *See* Exhs. 1, 4, 5, & 6 to Plaintiff's Brief.

## B. THE ALLEGED ROLE OF BERLIN & FARRO, AS TRANSHIPPER

As mentioned, Berlin & Farro disposed of waste at the Forest Waste Site. Berlin & Farro operated a liquid incinerator facility near Swartz Creek, Michigan where it allegedly incinerated liquid wastes and disposed of waste oils in the lagoons at the Forest Waste Site. During the period mentioned above from January 30, 1975 through July 19, 1975, plaintiff maintains that, after free liquids from the drums were drained by Berlin & Farro, drums containing "sludges, solids or residues were placed in a selected area and subsequently loaded on trailers and transported only to the Forest Waste Site for disposal." Plaintiff's Brief, p. 5 (citing Plaintiff's Exh. 5 ¶ 5 and Exh. 6, pp. 20–21).

In addition, according to plaintiff, some drums received by Berlin & Farro during the period in question contained no liquids but only solid or sludge wastes. *See* Plaintiff's Exhs. 5, ¶ 7 & 6, pp. 16–19. These drums were also allegedly transported to the Forest Waste Site for disposal. *Id.*

The crux of plaintiff's case against defendants centers upon each defendant's relationship with the alleged transhipper Berlin & Farro. According to plaintiff, each of these defendants are responsible for transporting for disposal a specified number of drums of waste to Berlin & Farro from January 30, 1975 through July 19, 1975.[4] Plaintiff then alleges that Berlin & Farro, in turn, disposed of hazardous substances, consisting of waste previously belonging to these defendants, at the Forest Waste Site.

As more specifically discussed hereinbelow, certain defendants dispute each of the following five allegations upon which plaintiff's case for contribution rests:

(1) that each of the defendants arranged for the disposal of drummed waste at the Berlin & Farro Site in Swartz Creek, Michigan;

(2) that each defendant's drummed waste that arrived at the Berlin & Farro Site contained solid materials;

(3) that each defendant's drummed waste contained residual solids after processing (i.e., being decanted) at Berlin & Farro;

(4) that each defendant's drummed waste contained residual solids which were *subsequently transhipped* to the Forest Waste Site for disposal; and, finally,

(5) that the residual solids in each defendant's drummed waste that were allegedly sent to the Forest Waste Site contained hazardous substances *similar to* the hazardous substances present at the Forest Waste Site which caused plaintiff to incur response costs.

---

**4.** According to plaintiff, these defendants are each responsible for shipping the following corresponding numbers of drums *to Berlin & Farro:* Bradford White Corporation (131 drums); Brunswick Corporation (224 drums); Chemetron Corporation (461 drums); Ciba Specialty Chemicals Corporation (305 drums); Eagle Ottowa Leather Company (80 drums); International Harvester/Navistar (374 drums); Keeler Brass Company (330 drums); Knape & Vogt Manufacturing Company, Inc. (54 drums); Knoll, Inc./Shaw Walker (24 drums); Motor Products–Owosso Corporation (34 drums); Pharmacia & Upjohn (19 drums); and Rowe International (17 drums).

*See* Defendant's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment, p. 2.

Plaintiff has produced no direct evidence that any defendant's drummed waste was disposed of at the Forest Waste Site. Instead, plaintiff relies on the proposed expert testimony of Eugene Meyer. Meyer's testimony, if admitted, would support the theory that defendants' waste was *transhipped* after processing at the Berlin & Farro Site for ultimate disposal at the Forest Waste Site. As will be discussed, certain defendants reject plaintiff's transshipment theory and the proposed expert testimony upon which it is based.

### III. MOTION 1: CERTAIN DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINIONS OF EUGENE MEYER

The twelve certain defendants listed above have moved to exclude expert opinions of Eugene Meyer. The instant motion was filed on February 1, 1999. Plaintiff filed its response on March 18, 1999. A reply brief was submitted by certain defendants on April 8, 1999.

### A. STANDARDS FOR THE ADMISSIBILITY OF EXPERT OPINIONS RELATING TO SCIENTIFIC EVIDENCE

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. An expert witness may base his opinion on facts or data "perceived by or made known to the ex-

pert at or before the hearing." Fed. R.Evid. 703. Such facts or data need not be admissible in evidence so long as they are of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.*

■ In a case such as the present one involving proposed expert testimony concerning *scientific* evidence, a district court must exercise a "gatekeeping role," applying several factors to determine the admissibility of such evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In *Daubert,* the United States Supreme Court set forth several non-exhaustive factors or "general observations" that a district court should apply in determining the admissibility of scientific evidence under Rule 702. As the Supreme Court stated,

> [f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. We are confident that federal judges possess the capacity to undertake this review. Many factors will bear on the inquiry....

*Id.* at 592–93, 113 S.Ct. 2786 (footnotes omitted).[5]

The *Daubert* Court enumerated the following "general observations" to be utilized in determining the reliability of scientific evidence:

> court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges.
> Fed.R.Evid. 104(a).

---

**5.** Federal Rule of Evidence 104(a) provides that

> [p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the

(1) whether a "[scientific] theory or technique ... can be (and has been) tested";

(2) whether it "has been subjected to peer review and publication";

(3) whether, in respect to a particular technique, there is a high "known or potential rate of error";

(4) whether there are "standards controlling the technique's operation"; and

(5) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Id.* at 592–94, 113 S.Ct. 2786.

The Sixth Circuit, commenting upon the application of the *Daubert* factors, has provided further guidance to trial courts:

These factors are to assist the court in determining "whether the analysis undergirding the experts' testimony falls within the range of accepted standards governing how scientists conduct their research and reach their conclusions." *Daubert* (on Remand), 43 F.3d at 1316. The Ninth Circuit (in *Daubert*) has added another factor to assist the court in its inquiry: "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying" because the former "provides important, objective proof that the research comports with the dictates of good science." *Id.* at 1317.

*Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299, 303 (6th Cir.1997). The Ninth Circuit's decision in *Daubert* (on remand) explains this additional factor adopted by the Sixth Circuit in *Smelser:*

[o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.

That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.

\* \* \* \* \* \*

If the proffered expert testimony is not based on independent research, the party *1318 proffering it must come forward with other objective, verifiable evidence that the testimony is based on "scientifically valid principles."

*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (on remand), 43 F.3d 1311, 1317–18 (9th Cir.), *cert. denied*, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (emphasis added).

**B. ANALYSIS**

Proposed expert Meyer has submitted an "Expert Report and Affidavit," attached as Exhibit 7 to plaintiff's motion for partial summary judgment. In this report, Meyer testifies that he has based his opinions on "[his] review of records and information, including deposition testimony, relating to the drummed wastes of each Defendant ... as well as [his] personal knowledge and expertise relating to hazardous substances." Exh. 7 to Plaintiff's Brief, ¶ 8. As to each defendant, Meyer essentially finds as follows: (1) that each defendant's waste contained solids; (2) that the solids would settle by gravity to the bottom of the drums in which they were stored; (3) that some residual solids would remain in the drums when the overlying liquids were poured or decanted at Berlin & Farro; and (4) that the residual solids contained hazardous substances of the type found at the Forest Waste Site.

Certain defendants advance three principal arguments seeking to exclude the proposed expert testimony of Eugene Meyer,

to wit: (1) that his opinions are scientifically unreliable under *Daubert* and thus inadmissible, (2) that his opinions are based upon a misunderstanding of the underlying facts, and (3) that he has failed to express opinions which are relevant to establishing whether defendants' wastes were transhipped, the crucial issue in the instant case.

With respect to certain defendants' first argument that Meyer's opinions are scientifically unreliable under *Daubert,* defendants point to Meyer's deposition testimony in which he admits that he has no personal knowledge concerning any of the defendants' waste sent to Berlin & Farro. See Exh. 1 to Certain Defendants' Motion to Exclude Expert Opinions of Eugene Meyer, pp. 70–72. Significantly, Meyer admits that he *conducted no studies, experiments, or literature searches* upon which to rest his opinions. *Id.* Defendants also rely on the fact that Meyer was able to form no opinions concerning the quantity of any residual solids which may have remained in any of defendants' drums after processing at Berlin & Farro. *Id.* pp. 153–56, 161, 345. In addition, and most significantly, Meyer testified that he did not know whether Berlin & Farro had sent drums to be recycled which contained some amount of solids. *Id.* p. 163. Defendants also point out that when specifically asked about the *Daubert* requirements, Meyer testified that he did not follow any published professional standards in reaching his opinions, that there are no peer reviewed standards for the work he performed, and, as mentioned above, that he did not perform any scientific tests to confirm his conclusions and that he did not evaluate any margin of error. *See id.,* pp. 154–56, 408–10.

In response, plaintiff asserts that "Dr. Meyer reviewed the available information regarding the Defendants' waste streams, and based on such information and his own experience regarding the type of waste streams and processes involved, formulated certain opinions regarding the constitu-

ents that would most likely be found...." Plaintiff's Response to Certain Defendants' Motion to Exclude, p. 2. According to plaintiff, the nature and characteristics of old waste streams are "rarely capable of scientific validation because the subject waste has been released into the environment, and the actual waste stream as produced by the generator is not available." *Id.* p. 3. With respect to defendants' claim that proposed expert Meyer does not meet the *Daubert* standards, plaintiff argues that "the inability to scientifically analyze and test waste streams is not fatal to the use of expert testimony in CERCLA cases." *Id.* (citing *B.F. Goodrich v. Betkoski,* 99 F.3d 505 (2d Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 2318, 141 L.Ed.2d 694 (1998)).

 This Court is required, pursuant to *Daubert* and its progeny, to inquire into whether Meyer's proposed expert testimony reflects valid scientific knowledge and whether the proffered expert testimony is relevant to the case at hand. *See Smelser,* 105 F.3d at ·303. Applying the *Daubert* factors, the Court finds that Meyer's proposed testimony does *not* comply with the *Daubert* standards. The proposed expert's testimony does not reflect a "theory or technique" that can and has been tested. Additionally, as Meyer admitted, he can point to no peer reviewed standards for the work he performed. He has not computed a "known or potential rate of error," nor has he identified "standards controlling the technique's operation." Most importantly, plaintiff has not demonstrated that Meyer's theory or technique enjoys "general acceptance" within a "relevant scientific community." The record is utterly lacking in any indicia that would establish *any* of the *Daubert* factors.

Nevertheless, plaintiff argues that *Daubert's* requirements should be found inapplicable in CERCLA actions, or, in any case, that there exists a CERCLA exception to *Daubert's* standards for admitting scientific evidence. In an attempt to support such proposition, plaintiff is only able

to cite one case, *Goodrich v. Betkoski, supra.* In that case, also involving a CERCLA action to recover clean-up costs, the Second Circuit found an expert's affidavit "highly probative" and allowed its admission. *See Betkoski,* 99 F.3d at 526. The expert's affidavit related to whether certain chemicals were contained in waste from various sources disposed of at landfills. *See id.* In reaching this decision, the Second Circuit remarked that "a CERCLA plaintiff is not required to prove its case with scientific certainty; a preponderance of the evidence is enough" and that "[e]nvironmental science, like epidemiology, 'is ill-suited to lead a factfinder toward definitive answers, dealing as it does in statistical probabilities.'" *Id.* at 525–26 (quoting *In Re Joint Eastern & Southern Dist. Asbestos Litig.,* 52 F.3d 1124, 1133 (2d Cir.1995)).

Plaintiff's reliance on *Betkoski* is misplaced. That case is factually distinguishable from the case at bar. The expert in that case utilized "EPA reports concerning municipal and industrial landfills in the United States and he set forth the types of hazardous substances found in waste streams generated by households, commercial establishments, institutions, and industries." *Id.* at 524. The court specifically found that the expert's affidavit was "carefully researched, detailed, and directly relevant to [the] case." *Id.* at 525. By contrast, in the case at bar, by his own admissions proposed expert Meyer conducted no research or literature search. He proffered nothing except his "experience" to support his conclusions that residual solids remained in the various defendants' waste. No representation was made as to the alleged quantity of hazardous substances which may have remained in defendants' waste or as to the likelihood that such substances were transhipped from Berlin & Farro to the Forest Waste Site.

In addition, and more importantly, this Court does not find that *Betkoski* represents an exception to *Daubert*'s gatekeep-

ing obligation, especially in light of recent Sixth Circuit and Supreme Court case law. *See, especially, Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065 (6th Cir.1999) (affirming trial court's decision in a CERCLA case to strike proposed expert's affidavit as based on "speculation, conjecture, and possibility" and affirming trial court's holding that the "inadequate factual basis" made the proposed expert's affidavit "scientifically unreliable"); *Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238, 1999 U.S. LEXIS 2189 (Mar. 23, 1999) (holding that *Daubert*'s "gatekeeping" obligation, requiring an inquiry into both relevance and reliability, applies not only to "scientific" testimony, but to all expert testimony); *see also U.S. v. SCA Services of Indiana, Inc.,* 1995 WL 569634, *4–*6 (N.D.Ind. Aug.15, 1995) (striking affidavit in CERCLA action on *Daubert* grounds); *Burns Philp Food, Inc. v. Cavalea Continental Freight, Inc.,* 135 F.3d 526, 530–31 (7th Cir.1998) (stating that "[d]istrict judges have an obligation to ensure that purportedly scientific expert testimony is reliable" and affirming trial court's exclusion of expert's affidavit on *Daubert* grounds).

In light of the foregoing considerations, this Court finds that proposed expert Meyer's testimony does not meet the *Daubert* requirement of scientific reliability. Meyer is unable to substantiate his conclusions with any source other than his own "experience." Plaintiff has failed to meet its burden of establishing that Meyer's conclusions are "based on sound science" by the "objective, independent validation of the expert's methodology." *Smelser,* 105 F.3d at 303. Meyer has utterly failed to point to any "objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that [he] has followed the scientific method...." *Daubert,* 43 F.3d at 1319. Meyer's "conclusions" repeated almost verbatim with respect to each identified

defendant represent nothing more than the proposed expert's *ipse dixit*. As such, his testimony it is inadmissible. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that district court is not required to admit opinion evidence which is connected to existing data only by *ipse dixit* of the expert; court may conclude that there is simply too great an analytical gap between the data and the opinion proffered).

Because this Court has found the proposed expert's testimony to be scientifically unreliable under *Daubert*, the Court need not consider defendants' two alternate grounds for excluding the proposed testimony, i.e., that Meyer's opinions are based upon a misunderstanding of the underlying facts and that he has failed to express opinions which are relevant to establishing whether defendants' wastes were transhipped to the Forest Waste Site.

Even assuming *arguendo* that Meyer's conclusions in his report were able to pass muster under *Daubert*, the Court nevertheless notes that the proposed testimony is unreliable for a further reason: it is based upon an apparent misconception of the facts regarding Berlin & Farro's decanting methods. Meyer testified at his deposition as follows:

> I am making these statements about the ability of various wastes to flow or pour in connection with my general understanding that these wastes are arriving at Berlin & Farro where the employees are *intentionally* decanting only the ...

liquid for subsequent incineration and leaving the solid in the drum.

*See* Exh. 1 to Certain Defendants' Motion to Exclude Expert Opinions of Eugene Meyer, pp. 394–95 (emphasis added). This assumption of "intentional" decanting of only the liquid portion of the waste is at odds with the unrebutted evidence presented by certain defendants that employees at Berlin & Farro made every effort to empty the drums and that any substance that would flow and that could be poured from the drums would be incinerated. *See* Brief in Support of Certain Defendants' Cross–Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment, § B.1, pp. 6–10 (citing Aff. of Charles Berlin ¶¶ 8–10 and Depo. of Frank Farro, pp. 18–19 and 29, contained within Joint Transcripts and Affidavits).[6]

In their reply brief, certain defendants note that proposed expert Meyer has now filed a new affidavit contradicting his prior deposition testimony relating to his assumption that Berlin & Farro employees had intentionally decanted only the liquid portion of the waste. *See* Reply Brief in Support of Certain Defendants' Motion to Exclude Expert Opinions of Eugene Meyer, p. 4 (citing new Affidavit of Dr. Eugene Meyer, attached as Exh. C to Plaintiff's Response). However, this Court is not bound to accept the assertions contained in the new affidavit. In fact, it is well-established that a plaintiff may not "create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the

---

**6.** In the Affidavit of Charles Berlin, for example, the former co-owner of Berlin & Farro stated as follows:

> Berlin & Farro never intentionally accepted solid waste at the Site ... Although some of the liquid waste contained some small quantity of non-liquid material, it did not render the drums incapable of being pumped or drained, or the contents unsuitable for incineration.
>
> \* \* .\* \* \* \*
>
> During the entire period that Berlin & Farro was in operation, drums were emptied

> by pumping out the contents into temporary holding tanks which fed the incinerator. If the material was "sludgy," solvents would be added as necessary to make it more pourable. Or, drums would be left to drain as long as necessary, within reason, to allow them to empty completely....

Aff. of Charles Berlin, ¶¶ 8 & 9.

plaintiff [or, in this case, plaintiff's expert] made in a prior deposition." *Jones v. General Motors Corp.*, 939 F.2d 380, 385 (6th Cir.1991) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986); *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)); *see also Plaskon Electronic Materials, Inc. v. Allied–Signal Inc.*, 904 F.Supp. 644, 663–64 (N.D.Ohio 1995) (applying the rule in the context of a CERCLA case).

Accordingly, the Court will grant certain defendants' motion to exclude expert opinions of Eugene Meyer on the basis that his proposed testimony is scientifically unreliable under *Daubert*. In the alternative, Dr. Meyer's opinions appear to be premised upon a misconception concerning the nature of Berlin & Farro's decanting process, and therefore may also be excluded as factually suspect.

## IV. MOTION 2: DEFENDANT PHARMACIA & UPJOHN COMPANY'S MOTION TO DISQUALIFY EUGENE MEYER, PH.D. FROM TESTIFYING AGAINST DEFENDANT PHARMACIA & UPJOHN COMPANY

In addition to certain defendants' motion discussed above, defendant Pharmacia & Upjohn Company has filed its own motion to disqualify Eugene Meyer. This motion was filed on February 1, 1999. Plaintiff submitted its response on March 18, 1999. Defendant Pharmacia & Upjohn Company filed a reply brief on April 9, 1999.

Defendant Pharmacia & Upjohn Company brings its motion to disqualify proposed expert Meyer based on two related grounds: (1) that Meyer and defendant company had executed a valid confidentiality agreement relating to a prior case unrelated to the instant litigation and (2) that an impermissible conflict of interest has arisen out of Meyer's prior work for defendant company.

Since this Court has already ruled that proposed expert Meyer's testimony must be excluded as scientifically unreliable under *Daubert*, the instant motion to disqualify is now moot. Accordingly, the Court need not enter into a discussion of the merits of the instant motion and will deny as moot defendant Pharmacia & Upjohn Company's motion to disqualify proposed expert Eugene Meyer.

## V. MOTIONS 3 AND 4: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT *AND* CERTAIN DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

On August 27, 1998, plaintiff Freeport–McMoran Resource Partners Limited Partnership ("Freeport") filed a motion for partial summary judgment. Plaintiff seeks a ruling from this Court on liability with a subsequent trial to be held to determine damages. As indicated above, the instant motion is brought against the following 15 defendants: (1) B–B Paint Corporation, (2) Bradford White Corporation, (3) Brunswick Corporation, (4) Chemical Recovery Systems Inc., (5) Chemetron Corporation, (6) Ciba Specialty Chemicals Corporation, (7) Eagle Ottowa Leather Company, (8) International Harvester/Navistar, (9) Keeler Brass Company, (10) Knape & Vogt Manufacturing Company, Inc., (11) Knoll, Inc./Shaw Walker, (12) Motor Products–Owosso Corporation, (13) Rowe International, (14) U.S. Chemical Co., Inc. and (15) Pharmacia & Upjohn Co. In addition, on January 29, 1999, plaintiff filed a separate motion for partial summary judgment against defendant William Greenway.

On February 1, 1999, certain defendants submitted a brief in support of certain defendants' cross-motion for summary judgment and in opposition to plaintiff's motion for partial summary judgment. These "certain defendants" consist of the following twelve defendants: (1) Bradford White Corporation, (2) Brunswick Corporation, (3) Chemetron Corporation, (4) Ciba Specialty Chemicals Corporation, (5)

Eagle Ottowa Leather Company, (6) International Harvester/Navistar, (7) Keeler Brass Company, (8) Knape & Vogt Manufacturing Company, Inc., (9) Knoll, Inc./ Shaw Walker, (10) Motor Products–Owosso Corporation, (11) Pharmacia & Upjohn, and (12) Rowe International. Also on February 1, 1999, defendant *B–B Paint Corporation* filed its own motion for summary judgment. On February 16, 1999, defendant *William Greenway* filed his own motion for summary judgment against plaintiff. On March 18, 1999, plaintiff submitted its response to certain defendants' motion for summary judgment and reply in support of plaintiff's motion for partial summary judgment. Finally, on April 8, 1999, certain defendants submitted their reply brief in support of cross-motion for summary judgment.

The discussion below will focus on plaintiff's motion for partial summary judgment and on certain defendants' response and cross-motion for summary judgment.

## A. LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). In evaluating a motion for summary judgment, the Court must view the evidence in a light most favorable to the nonmovant, as well as draw all reasonable inferences in the nonmovant's favor. *See U.S. v. Diebold,*

369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed. R.Civ.Proc. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,*

[t]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The evidence itself need not be presented in a form which would be admissible at trial. *See North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1283 (1997). The evidence must be more than the nonmovant's own pleadings and affidavits. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990).

## B. ANALYSIS

### 1. CERCLA'S SECTION 113(F) ACTION FOR CONTRIBUTION AND THE ELEMENTS OF THE PRIMA FACIE CASE

■ CERCLA provides for two methods whereby parties may recover response

costs incurred as a result of an environmental clean-up effort. The first cause of action is governed by CERCLA Section 107(a), 42 U.S.C. § 9607(a), and sets forth the requirements for joint and several liability. Such an action may be brought by the government or by innocent parties who have incurred response costs. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 3 F.Supp.2d 799, 805 (W.D.Mich.1998), *aff'd*, 171 F.3d 1065 (6th Cir.1999). The second method is an action for contribution brought by a potentially responsible party (PRP) against another PRP pursuant to CERCLA Section 113(f), 42 U.S.C. § 9613(f).

 In the case at bar, plaintiff, itself a PRP, has brought contribution claims for clean-up costs against several potentially liable defendants pursuant to CERCLA Section 113(f), 42 U.S.C. § 9613(f).[7] Indeed, plaintiff as a PRP itself is barred under Sixth Circuit case law from bringing its claim under Section 107(a) for joint and several liability. *See Centerior Svc. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 351 (6th Cir.1998) (holding that cost recovery action by PRPs who were compelled by EPA order to initiate hazardous waste site cleanup who sought cleanup costs from other PRPs was necessarily an action for contribution, and was therefore governed by CERCLA's contribution provision, rather than provision governing joint and several cost recovery actions, regardless of whether plaintiff PRPs had settled with EPA or had been adjudged liable under CERCLA).

As a consequence, this Court must examine plaintiff's claims under the rules for evaluating Section 113(f) claims and *not* under the somewhat different rules applicable in Section 107(a) actions. As another federal court located in Michigan recently remarked in a similar case,

> [a] number of courts have recognized a distinction between a cost recovery action brought by the government or other innocent party, and a contribution action brought by one PRP against another. As this Court noted in its opinion on the motions for partial summary judgment, an action for contribution under § 113(f) differs in material respects from a cost recovery action under § 107. There is a difference in the applicable statute of limitations, and there is a difference in whether liability will be several or joint. There is also a difference occasioned by the application of equitable contribution principles in § 113(f) actions. The contours of all CERCLA claims by and between PRPs who contributed waste to a site are governed by the equitable contribution principles of § 113(f). *Sun Co., Inc. (® & M) v. Browning–Ferris, Inc.*, 124 F.3d 1187, 1191 (10th Cir.1997). These equitable contribution principles permit the court to consider whether or to what degree the defendant caused the response costs in a § 113(f) contribution action. *But see Premium Plastics v. LaSalle National Bank*, 904 F.Supp.

7. Plaintiff also brings its claims under the Michigan Natural Resources and Environmental Protection Act (NREPA), M.C.L. § 324.3101 *et seq.*; MSA 13A.3101 *et seq.* This state law claim was originally dismissed in the exercise of this Court's discretionary power to hear supplemental state law claims. An order to this effect was entered on January 10, 1997. However, upon reconsideration, this Court reinstated plaintiff's NREPA claim pursuant to an order entered March 31, 1997.

Although plaintiff mentions the Michigan statute in passing at the beginning of its brief, there is no further reliance on NREPA. Accordingly, the Court will assume that the same analysis applies both to plaintiff's claims

under CERCLA and under NREPA. This approach is consistent with the Sixth Circuit's approach taken in *Kalamazoo River:*

> NREPA (formerly MERA) was patterned after CERCLA, and is construed in accordance with CERCLA. *Kelley v. Tiscornia*, 827 F.Supp. 1315, 1318 n. 1 (W.D.Mich. 1993); *Flanders Industries, Inc. v. Michigan*, 804 203 Mich.App. 15, 21, 512 N.W.2d 328 (1993). Accordingly, for purposes of this motion the Court will assume that Plaintiff's claims under Part 201 of the NREPA ... will stand or fall under the same analysis applied to the claims under CERCLA.

*Kalamazoo River*, 3 F.Supp.2d at 803.

809, 815 (N.D.Ill.1995) ("CERCLA in no way states or implies that private plaintiffs bear a heavier burden of proof than government plaintiffs.").

*Kalamazoo River,* 3 F.Supp.2d at 805 (Bell, J.) (footnotes omitted).

■ It having been firmly established that plaintiff is limited to a Section 113(f) action for contribution, this Court will next explore the prima facie elements of such an action. Despite the differences between the two actions, mentioned above, the prima facie elements under both Section 107 and Section 113 are as follows:

(1) there was a release or threatened release of a hazardous substance;

(2) the site of the release or threatened release is a "facility" as defined in 42 U.S.C. § 9601(9);

(3) the release or threatened release has caused the plaintiff to incur "necessary costs of response"; and

(4) the defendant falls within one of the four categories of PRPs as set forth in 42 U.S.C. § 9607(a)

*See* 42 U.S.C. § 9607(a); *see also Centerior,* 153 F.3d at 348; *Kalamazoo River,* 3 F.Supp.2d at 805; *ABB Indus. Sys. v. Prime Technology, Inc.,* 120 F.3d 351, 356 (2d Cir.1997); *FMC Corp. v. Aero Indus., Inc.,* 998 F.2d 842, 845 (10th Cir.1993) (citing *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989)); *Plaskon Electronic Materials, Inc. v. Allied–Signal, Inc.,* 904 F.Supp. 644, 659 (N.D.Ohio 1995). In addition, "[i]n actions seeking contribution [under Section 113(f) ], unlike those for joint and several cost recovery, the burden is placed on the plaintiff to establish the defendant's equitable share of response costs." *Centerior,* 153 F.3d at 348 (citing *Adhesives Research Inc. v. American Inks & Coatings Corp.,* 931 F.Supp. 1231, 1244 n. 13 (M.D.Pa.1996) and *United States v. Taylor,* 909 F.Supp. 355, 361 (M.D.N.C.1995)). "Liability is not joint and several, but merely several." *Id.* (citing *United States v. Conservation Chemical Co.,* 619 F.Supp. 162, 229 (W.D.Mo.1985)).

Pursuant to Section 107(a), "responsible person" is defined as a party who falls within one of following four categories:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a).

Plaintiff relies on the third alternative definition of "responsible person," seeking to establish so-called "generator liability" on the part of each defendant. According to plaintiff, defendants generated and arranged for the disposal of drummed waste at the Berlin & Farro Site during January 1, 1975 through July 19, 1975. *See* Plaintiff's Brief, p. 18. Further, plaintiff claims that such drummed waste was commingled and became unidentifiable at the Berlin & Farro Site. *Id.* At some point thereafter the drums sent to the Berlin & Farro Site, after being drained of all liquids, were *transhipped* from the Berlin & Farro Site to the Forest Waste Site. *Id.* at p. 19

(citing Exhs. 4, 5, and 6). Despite being drained of liquids, plaintiff contends that said drums still contained solids, sludges or residues. *Id.*

■ To establish "generator liability" under CERCLA, plaintiff, at a minimum, must establish that defendants' hazardous wastes were deposited at the site from which a release occurred. In an extensive opinion dealing with the summary judgment standard and its application in CERCLA causes of action, the United States District Court for the Northern District of Indiana stated that

> plaintiffs [in such cases] bear the burden on two factual issues: (1) whether each defendant's hazardous waste was disposed of at the Site; and (2) whether the hazardous substances similar to those contained in each defendant's waste were present at the Site. First, if the plaintiffs do not prove that each defendant's hazardous waste was disposed of at the Site, the court need not reach the second issue—whether hazardous substances similar to those contained in each defendant's waste were present at the Site. Second, logic dictates that if the plaintiffs cannot prove (even by inference) what, if any, hazardous substances were in each defendant's waste, then the plaintiffs cannot prove that hazardous substances similar to those contained in each defendant's waste were present at the Site.

*Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1500 (N.D.Ind.1994); *see Acme Printing Ink Co. v. Menard, Inc.,* 891 F.Supp. 1289, 1296 (E.D.Wis.1995).

The *Dana* court also set forth the following helpful commentary regarding application of Federal Rule of Civil Procedure 56 in the context of a CERCLA case, such as the one presently before this Court:

> Summarizing the discussion of the summary judgment and CERCLA standards, the plaintiffs' obligation under Rule 56 is no different because this is a CERCLA case. The plaintiffs must present evidence which, when all reasonable inferences are drawn in the plaintiffs' favor, is sufficient to allow a trier of fact to find that it is more likely than not that a given defendant sent identifiable hazardous waste to the site in question. As in every summary judgment case, the defendants have no burden of proving the contrary, but merely must point out the alleged defects in the plaintiffs' proof. That CERCLA is a remedial statute does not affect the operation of Rule 56.
>
> Because reasonable, permissive inferences must be drawn in the plaintiffs' favor at the summary judgment stage, the plaintiffs need not present eyewitness testimony providing a complete chain of custody of hazardous waste from a defendant to the landfill. It is sufficient if circumstances allow an inference from which a trier of fact could make a finding by a preponderance of the evidence. So, in several cases cited by the plaintiffs, courts have held that if the plaintiffs show that a defendant generated a predictable and relatively consistent waste stream that included hazardous waste of a sort ultimately found at the site, and that defendant's waste was regularly taken to the site, an inference that the waste found at the site came from that defendant is permissible and is sufficient to defeat a summary judgment motion, even if it would not ultimately be sufficient to persuade the trier of fact.
>
> As in any summary judgment case, the plaintiffs must make their showing, whether directly or indirectly, through evidence that has probative value, meaning there must be something more than testimony that something "could be" or "might be"—in other words, there must be evidence of something beyond a witness effectively saying that "anything's possible", because such evidence is not sufficient to support a finding.

*Dana,* 866 F.Supp. at 1497–98.

At the outset, it is clear from the record that plaintiff is able to establish that there

is no genuine issue of material fact with respect to three out of the four elements of its prima facie case. First, plaintiff has demonstrated that there was "a release or threatened release of a hazardous substance" at the Forest Waste Site. This is evidenced by the hazardous substances found in the soil and groundwater at the site. *See* EPA Declaration for the Record of Decision dated March 31, 1988, attached as Exh. 2 to Plaintiff's Brief.

Second, plaintiff has shown that the Forest Waste Site is a "facility," as that term is defined in CERCLA. As the Act provides, the term "facility" means "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located...." 42 U.S.C. § 9601(9). As previously stated, there is no question that hazardous substances were disposed of at the Forest Waste Site, and thus this site qualifies under this definition as a "facility." Moreover, in 1982, the EPA placed the Forest Waste Site on the National Priorities List due to releases of hazardous substances, and subsequently ordered response actions for the cleanup of the site. *See* Aff. of Stephanie Gordinier, attached as Exh. 1 to Plaintiff's Brief.

Third, there appears to be no dispute that the release of hazardous substances has resulted in plaintiff's having to incur "necessary costs of response." *See id.* As Ms. Gordinier, plaintiff's senior environmental engineer, testified, "[w]ith respect to the landfill area of the Forest Waste Site, response action have included field investigations, excavation and offsite treatment of soil and drums, the installation of RCRA cap, operation and maintenance of the cap system, installation of groundwater monitoring wells, groundwater investigations, and monitoring." *Id.* ¶ 8. To date, according to Ms. Gordinier, the response costs relating to the landfill portion of the Forest Waste Site have totaled more than $10 million, of which plaintiff has paid approximately $ 2.3 million. *Id.* ¶ 9.

As defendants do not contest these three elements in their responsive brief, the Court's examination will focus on the fourth and crucial element of plaintiff's prima facie case. This element, as mentioned above, concerns the identification of each defendant as a "responsible party" as that term is defined in 42 U.S.C. § 9607(a). In the context of summary judgment motions, such as the present ones, the moving party must present evidence sufficient to show the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). This burden "may be discharged by showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.Proc. 56(e); *Gregg*, 801 F.2d at 861. The discussion below will examine whether the moving party has met its initial burden and whether the responding party has set forth facts showing a triable issue.

## 2. THE CAUSATION ISSUE

At the root of the disagreement between the parties is the issue of causation. Specifically, the parties are in dispute as to the appropriate standard of causation which should be applied to determine "generator liability" in the instant case.

Plaintiff argues for strict liability, i.e., that it is not necessary to show that a particular defendant intended or knew that its waste had been sent to the site in question. *See U.S. v. Cannons Engineering Corp.*, 720 F.Supp. 1027 (D.Mass.1989), *aff'd*, 899 F.2d 79 (1st Cir.1990). It is also not necessary, according to plaintiff, to trace the release of hazardous waste to a particular generator to establish liability. *U.S. v. Distler*, 803 F.Supp. 46 (W.D.Ky. 1992).[8] Furthermore, plaintiff maintains that liability under CERCLA may be imposed so long as "hazardous substances

8. Plaintiff cites this Court's prior memoran-

dum opinion and order granting defendant's

'like' those contained in the defendant's waste were found at the site." *U.S. v. Fairchild Indus. Inc.,* 766 F.Supp. 405, 415 (D.Md.1991).

■■ Certain defendants argue in response that *Distler* is distinguishable from the case at bar. This Court agrees. *Distler* involved a claim brought by an innocent party under CERCLA, Section 107(a) and *not,* as in the case at hand, a claim brought by a potentially responsible party under CERCLA, Section 113(f). As the Eighth Circuit recognized in *Farmland Industries v. Morrison–Quirk Grain Corp.,* 987 F.2d 1335 (8th Cir.1993), a different standard of causation applies in a case brought by the government as opposed to a case brought by a PRP. In a Section 107(a) action, "liability to the United States for CERCLA response costs is a matter of strict liability ... Liability, therefore, is not dependent on any showing of causation or fault." *Id.* at 1339. However, a private party cannot predicate a claim for contribution solely upon Section 107, "but must also prove causation." *Id.* at 1340.

■ As several federal district courts have noted, the so-called "alternative liability doctrine" which allows a plaintiff to shift the burden of proving liability to two or more potentially liable defendants is *only* available "when the party seeking to invoke the doctrine is blameless [which is *not* the situation in the present case]." *New Jersey Turnpike Authority v. PPG Industries, Inc.,* 16 F.Supp.2d 460, 471 (D.N.J.1998) (rejecting plaintiff's attempt to shift burden of proof to defendants in a CERCLA Section 113(f) action); *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 3 F.Supp.2d 799, 804 (W.D.Mich. 1998), *aff'd,* 171 F.3d 1065 (6th Cir.1999) (emphasizing the distinction between cost recovery action brought by government or other innocent party and a contribution

action brought by one PRP against another);. *Acushnet Co. v. Coaters, Inc.,* 937 F.Supp. 988, 998 (D.Mass.1996) (same).

This precise issue was recently settled by the Sixth Circuit in a decision handed down on March 26, 1999, *after* the filing of certain defendants' brief on February 1, 1999. *See Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065 (6th Cir.1999). In that case, the appellate court held that "[i]n a 'two-site' case ... where hazardous substances are released at one site and allegedly travel to a second site, in order to make out a prima facie case, *the plaintiff must establish a causal connection* between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Id.* at 1068 (citing *Thomas v. FAG Bearings Corp.,* 846 F.Supp. 1382, 1387 (W.D.Mo.1994)).

■ In light of the Sixth Circuit's recent ruling in *Kalamazoo,* this Court must reject plaintiff's attempt to apply strict liability. Instead, plaintiff will be required to prove causation, in other words, plaintiff "must proffer evidence sufficient to support a finding that hazardous substances traceable to the defendant are in nature, quantity, and durability sufficient [to impose liability]." *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 3 F.Supp.2d 799, 806 (W.D.Mich.1998) (citing *Acushnet Co. v. Coaters, Inc. ("Acushnet II"),* 948 F.Supp. 128, 136 (D.Mass.1996)).

3. **WHETHER THERE EXISTS EVIDENCE SUFFICIENT TO SUPPORT A FINDING OF A GENUINE ISSUE OF MATERIAL FACT WITH RESPECT TO EACH OF THE RESPONDING DEFENDANTS.**

In order to evaluate plaintiff's motion for partial summary judgment, it will be

motion to dismiss issued October 31, 1997. In that opinion, this Court cited *Distler,* in passing, for the proposition that "[a] party who arranges to dispose of waste at one site ... may be held liable for the clean-up at another site ... regardless of the party's intent or knowledge...." *Distler,* 803 F.Supp.

at 50–51. However, for the reasons discussed below and in light of recent Sixth Circuit case law, this Court finds that *Distler* is inapposite to the case at bar. Thus, the instant memorandum opinion and order in this regard *supersedes* this Court's prior order entered October 31, 1997.

necessary to review the evidence proffered by plaintiff as to each defendant to determine whether plaintiff has satisfied its burden of demonstrating the existence of an absence of any genuine issue of material fact pursuant to Federal Rule of Civil Procedure 56. In addition, for the sake of efficiency, the Court will at the same time also consider any evidence submitted by defendants in support of *their own* cross-motion for summary judgment.

It should also be noted that the plaintiff relies heavily on the proposed expert testimony of Eugene Meyer throughout its brief in support of its motion for partial summary judgment. For the reasons stated above, the Court has ruled Meyer's testimony inadmissible and thus will not consider such testimony in evaluating the parties' summary judgment motions.

## (1) DEFENDANT BRADFORD WHITE CORPORATION

Plaintiff has produced Michigan Department of Natural Resources Liquid Industrial Waste Removal Records (hereinafter "MDNR records") purporting to show that 131 drums of waste were sent to Berlin & Farro by defendant Bradford White Corporation ("Bradford White"). *See* Exh. 10 to Plaintiff's Brief. Plaintiff alleges that these drums contained waste solvents and paint, spent trichloroenthylene and used engine oil. *See* Exhs. 10–11 to Plaintiff's Brief. Plaintiff relies on the deposition of Wayne Johnson and the testimony of proposed expert witness Eugene Meyer. For the reasons set forth above, the Court shall not consider Meyer's testimony. Defendant Bradford White has presented the affidavit of Mike Ward in support of its position that any wastes from painting operations would have contained only a minimal quantity of paint.

Wayne Johnson is manager of manufacturing engineering for defendant Bradford White and is currently responsible for environmental matters at the company. *See* Johnson Depo., pp. 4–5, attached as Exh. 11 to Plaintiff's Brief in Support of Motion for Partial Summary Judgment. Mr. Johnson at his deposition testified that the "waste liquid" produced by Bradford White could have been either a mixture of solvent and hydraulic oil, or trichloroethylene and oil from a degreasing operation, or spent trichloroethylene from washing of parts from truck serviced at the company's garage. *See* Johnson Depo. pp. 11–12. After reviewing Mr. Johnson's deposition in its entirety, the Court finds that the testimony contained therein does not raise a genuine issue of material fact. Plaintiff, relying upon the deposition testimony of Wayne Johnson, has failed to proffer any evidence that hazardous substances traceable to defendant Bradford White were transhipped from Berlin & Farro to the Forest Waste Site. Accordingly, the Court will deny plaintiff's motion for partial summary judgment as to defendant Bradford White Corporation.

With respect to certain defendants' motion for summary judgment, defendants cite the affidavit of Mike Ward, a Bradford White employee who is responsible for maintenance of the paint booths. *See* Aff. of Mike Ward, ¶ 2. Mr. White testifies that prior to 1982, Bradford White utilized a paint which was much less susceptible to dripping into the hydraulic ram pit beneath the paint booths than paint that was utilized subsequent to 1982. Id. ¶¶ 4 and 7. He also attests that prior to 1982, little if any paint was present in the liquid which had to be removed from the paint booth pits as a result of hydraulic leaks.

The Court finds that the evidence submitted by defendant Bradford White in the form of deposition testimony of Wayne Johnson and the affidavit of Mike Ward support defendant's position that none of the drummed wastes sent to Berlin & Farro contained any appreciable quantities of residual solids. In fact, the testimony of these witnesses supports a finding that the wastes attributable to defendant company, i.e., oils, trichloroethylene, and paint solvents would have been removed from drums in which they were transported and

incinerated at Berlin & Farro. As indicated above, plaintiff has offered no admissible evidence to rebut the testimony of defendant's employees. The Court therefore finds that defendant has met its burden of demonstrating an absence of any genuine issue of material fact. Accordingly, the Court will grant certain defendants' motion for summary judgment as to defendant Bradford White Corporation.

## (2) DEFENDANT BRUNSWICK CORPORATION

Plaintiff has produced MDNR records purporting to show that 224 drums of waste were sent to Berlin & Farro by defendant Brunswick Corporation ("Brunswick"). *See* Exh. 12 to Plaintiff's Brief. Plaintiff alleges that these drums contained paint sludge and resin/methylene chloride. *See* Exh. 12–13 to Plaintiff's Brief. Plaintiff also relies on the deposition testimony of Bill Towers. Again, plaintiff relies upon the conclusions set forth in the affidavit of proposed expert Meyer. This testimony may not be considered for the reasons stated above.

The records produced by plaintiff establish that "waste liquid" was sent by Brunswick to Berlin & Farro. *See* Exh. 12 to plaintiff's brief. The records also appear to indicate that the drummed waste contained "paint sludge" and "resin/methylene chloride." *See* Exh. 13 to plaintiff's brief. Mr. Towers has been a Brunswick employee since 1978 and testified that the liquid waste generated from the painting operation could have contained paint solvents, reducers, thinners, and gun wash from cleaning out paint guns. *See* Depo. of Bill Towers, 25–26. However, defendant points out that Mr. Towers offered no testimony as to whether the "paint sludge" originated with the cleaning of paint guns or from some other source. Thus, according to defendant, the source and characteristics of the contents of the drums sent to Berlin & Farro are unknown. Defendant further argues that Mr. Towers provides no testimony relating to the process by which waste consisting of resin and methylene chloride could have been generated and plaintiff has produced no evidence from which the characteristics of such a mixture can be determined.

The Court finds that plaintiff has failed to raise a genuine issue of material fact that any hazardous substances traceable to defendant Brunswick were transhipped from Berlin & Farro to the Forest Waste Site. Accordingly, the Court must deny plaintiff's motion for partial summary judgment as to defendant Brunswick.

In support of its motion for summary judgment, defendant Brunswick argues that the evidence shows that the types of wastes attributable to Brunswick are types which were readily incinerated at the Berlin & Farro Site. In support of this position, defendant cites the deposition testimony of Ronald L. Jackson, an employee of Berlin & Farro during the time period in question. Mr. Jackson testified as follows:

> I may not have handled every drum [coming into Berlin & Farro], but over the course of my employment there I did handle drums from every firm that did come in there. Basically the drums that came from every location into Berlin & Farro were almost the same . . . Approved [Industrial Removal, the transport company] brought drums in there that were good, nothing but liquid [so] that the drums would in fact empty out wholly. *The stuff from U.S. Chemical, the stuff from Stauffer Chemical, the stuff from Chemical Recovery usually all had solids or sludges in that [they] did not dump clean.*

Depo. of Ronald L. Jackson, pp. 36–37; *see also* Baldwin Depo., pp. 43, 55–57; Farro Depo. 46; Werchowsky Aff. ¶ 4; Berlin Aff. ¶¶ 4–11. It is undisputed that Brunswick was a customer of Approved Industrial Removal [hereinafter "Approved"], the company transporting the drums to Berlin & Farro. *See* Werchowsky Aff. ¶ 10.

In light of the above unrebutted testimony, defendant Brunswick has satisfied its burden of showing an absence of any genuine issue of material fact which would necessitate a trial in the instant case. Accordingly, the Court will grant certain defendants' motion for summary judgment as to Brunswick Corporation.

### (3) DEFENDANT CHEMETRON

Plaintiff has produced MDNR records, attached as Exh. 15 plaintiff's brief. The records indicate that Approved Industrial Removal disposed of 461 drums of liquid waste/waste solvent on behalf of Chemetron between January 6, 1975 and July 17, 1975. *See id.* According to the records, the drums were shipped to the Berlin & Farro Site. *See id.*

■ Defendants object to the admissibility of the MDNR records as unauthenticated and as hearsay pursuant to the Federal Rules of Evidence. It is well-settled that a court cannot consider inadmissible hearsay when reviewing a motion for summary judgment. *See Wiley v. U.S.,* 20 F.3d 222, 226 (6th Cir.1994) However, plaintiff in its reply brief maintains that the State of Michigan Liquid Industrial Waste Removal Records were required by law to be filed with the MDNR and were in fact so filed. Plaintiff further argues that the records were found in the possession of and have been certified by the State of Michigan Department of Environmental Quality. *See* Exh. 37 to Plaintiff's Response Brief. With respect to authentication, plaintiff has produced the affidavit of Judi McGee, the representative of Approved who prepared the records in 1975. *See* Exh. 45 to Plaintiff's Response Brief.

The Court finds that these records are admissible under the public records exception to the hearsay rule found in Federal Rule of Evidence 803(8) and that these records have been properly authenticated. Pursuant to Rule 803(8) "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report [may be admitted] . . . unless the sources of information or other circumstances indicate lack of trustworthiness." There is no indication that these records are lacking in trustworthiness. Thus, the Court will consider these records in evaluating the parties' cross motions.

However, these records in and of themselves do not create a genuine triable issue. Defendant Chemetron has put forth evidence showing that even if Chemetron had sent drums of waste to Berlin & Farro, such waste would have been delivered by Approved and incinerated at the Berlin & Farro Site. The MDNR records state that Chemetron's waste that was shipped to Berlin & Farro was "incinerated." Moreover, the testimony of the former owners and employees of Berlin & Farro confirm that wastes shipped to the site were incinerated. *See* Berlin Aff. ¶ 4; Farro Depo. p. 46; Baldwin Depo. p. 43 and 55; Hoeve Depo. pp. 91–94. In addition, defendants point to deposition testimony of Marion Hoeve, Chemetron's Waste Disposal Manager in 1975, who stated that Approved picked up spent solvent waste from defendant company for the purpose of incineration. *See* Hoeve Depo. pp. 92–93; *see also* Werchowsky Aff. ¶ 10. Such spent solvent waste like the waste transported by Approved "would flow out," according to Hoeve. Hoeve Depo. pp. 93–94.

Given the unrebutted testimony advanced by defendant company, plaintiff has failed to raise a genuine issue of fact relating to whether any residual solids remained in the drums after processing at Berlin & Farro. Accordingly, the Court will deny plaintiff's motion for partial summary judgment as to defendant Chemetron and grant certain defendants' motion for summary judgment as to this defendant.

### (4) DEFENDANT CIBA SPECIALTY CHEMICALS CORPORATION

Plaintiff has produced MDNR records which purport to show that Ciba Speciality Chemicals Corporation ("Ciba"), then known as Ren Plastics, arranged for the disposal of 305 drums of waste at Berlin & Farro from January 1, 1995 through July 19, 1995. See Exh. 19 to Plaintiff's Brief in Support of Motion for Partial Summary Judgment. The drums allegedly contained solvents mixed with epoxy, urethane and acrylic products. See Exh. 20, pp. 28–41.

Defendant Ciba argues that plaintiff, however, has produced no documents indicating that any drums from Ciba were transported by Berlin & Farro to the Forest Waste Site. See Gordinier Depo. pp. 71–80. Defendant further points out that none of the fact witnesses deposed presented any evidence connecting Ciba to the disposal of drummed waste at the Forest Waste Site. See Baldwin Depo. pp. 48, 78; Farro Depo. 75–76; Jackson Depo. p. 72. According to Ciba's witness, Michael Munsell, the waste solvents sent by Ciba to Berlin & Farro were "thin, off-colored liquids" which may have contained "suspended solids," but not "sludges." Munsell Depo. pp. 38, 54. Based on this evidence, defendant concludes that Ciba's waste material would have readily poured from the drums in the Berlin & Farro incinerator. See Certain Defendants' Brief in Response, p. 55.

Since plaintiff has failed to put forward any evidence that Ciba's drummed waste was disposed of at the Forest Waste Site, plaintiff has failed to raise a genuine issue of material fact. To the contrary, the evidence presented by defendant Ciba tends to establish that Ciba's waste was incinerated at Berlin & Farro. Accordingly, plaintiff's motion for partial summary will be denied as to defendant Ciba and certain defendants' motion for summary judgment will be granted as to that defendant.

### (5) DEFENDANT EAGLE OTTAWA LEATHER COMPANY

Plaintiff has produced MDNR records purporting to show that defendant Eagle Ottawa Leather Company ("Eagle Ottawa") arranged for the disposal of 80 drums of waste at the Berlin & Farro Site. See Exh. 19 to Plaintiff's Brief. Plaintiff also alleges that the drums contained "a solvent and vinyl mixture," citing deposition testimony of Lowell Rasmussen. Rasmussen Depo. pp. 31–41.

Defendant Eagle Ottawa disputes plaintiff's assertion that the drums contained a mixture of a solvent and vinyl. According to defendant, plaintiff's reliance on the deposition testimony of Lowell Rasmussen is misplaced. After reviewing the Rasmussen deposition, this Court agrees. Even if the waste produced by Eagle Ottawa could be characterized as a combination of a solvent and vinyl, Rasmussen clearly described the vinyl-solvent mixture as "slurry"—"you could pour it, you could pump it." See Rasmussen Depo. pp. 32–33. This testimony flatly contradicts plaintiff's theory that the waste would stay in the drums and would not have been poured out during processing at Berlin & Farro.

For these reasons, plaintiff has failed to raise a genuine issue of material fact. Accordingly, plaintiff's motion for partial summary as to defendant Eagle Ottawa will be denied and certain defendants' motion for summary judgment as to that defendant will be granted.

### (6) DEFENDANT INTERNATIONAL HARVESTER/NAVISTAR

Plaintiff has produced MDNR records indicating that defendant International Harvester/Navistar (hereinafter "Navistar") arranged for the disposal of 374 drums of waste paint at the Berlin & Farro Site. See Exhs. 23–25 to Plaintiff's Brief. Plaintiff alleges that after the liquid was poured out of defendant's drums at Berlin & Farro, residual solids remained in the drums, those drums were transhipped to the Forest Waste Site, and

that the residual solids contained hazardous substances similar to those found at the Forest Waste Site. *See* Plaintiff's Brief, pp. 10, 18–19. Plaintiff relies on the following in an attempt to support these allegations: the Liquid Industrial Waste Removal Records (attached as Exh. 23 to plaintiff's brief), testimony of Navistar employees, Al Pancake and Gene Kalthoff, as well as the affidavit testimony of Dave Byker, who transported Navistar's drums to Berlin & Farro as an employee of Approved during the time period in question.

Defendant Navistar rejects plaintiff's reliance on the above sources. As defendant points out, the removal records (Exh. 23) refer to the Navistar drums transported by Approved to Berlin & Farro as containing "waste liquid" and not paint. With respect to the deposition testimony of Navistar employee Gene Kalthoff, he testified that he never heard of Berlin & Farro and that he had "no idea" what the term "waste liquid" on the removal records could have meant. *See* Kalthoff Depo. pp. 90–92. Furthermore, Pancake testified that he also had not heard of Berlin & Farro, that he did not know what types of waste Navistar generated in 1975 because he had no waste handling duties until 1987, and that liquid paint wastes were always picked up by tankers. *See* Pancake Depo. pp. 13–14; 29–31. With respect to former employee of Approved, Dave Byker, he testifies that during the period at issue he transported "drums of waste from International Harvester to Berlin & Farro." Aff. of Dave Byker ¶ 3. According to Byker, "these drums of waste from International Harvester contained paint." *Id.* However, as defendant points out, Byker has provided absolutely no foundation for his bald assertion that the drums contained "paint." As such, the Court cannot give great weight to the allegation.

The Court finds that plaintiff has provided no evidence that any residual solids remained in Navistar's drums after they were allegedly emptied at Berlin & Farro. In fact, plaintiff's theory that the residual solids remained in the drums is based exclusively on proposed expert testimony, which testimony has been disallowed by this Court.

Defendant has put forward evidence that the drums received at Berlin & Farro were immediately dumped into tanks for incineration. *See* Depo. of Michael Carl Baldwin. Defendant also has provided the testimony of Charles Berlin, former owner of Berlin & Farro, that the drums were allowed to drain as long as necessary, within reason, in order to allow them to drain completely. Aff. of Charles Berlin ¶ 9. Berlin also testified that vacuum tanks were sometimes used to pump out drums and that solvents were sometimes added to make their contents more pourable. *Id.* ¶¶ 9–10.

Even assuming *arguendo* that Navistar's drums contained paint after they were drained at Berlin & Farro, plaintiff still has put forward no evidence that any Navistar drums were ever transhipped from Berlin & Farro to the Forrest Waste Site. Plaintiff has thus failed to raise a genuine issue of material fact. As a consequence, this Court will deny plaintiff's motion for partial summary as to defendant International Harvester/Navistar and grant certain defendants' motion for summary judgment as to that defendant.

### (7) KEELER BRASS COMPANY

Plaintiff alleges that 330 drums of "waste solvent," "waste oil and liquid," and "waste liquid" were sent to Berlin & Farro by defendant Keeler Brass Company ("Keeler Brass"). Plaintiff relies upon MDNR removal records for this information. *See* Exh. 26 to Plaintiff's Brief. Plaintiff also relies upon the deposition testimony of David VanHuis, an employee of defendant Keeler Brass since 1969. Defendant does not appear to contest the evidence submitted by plaintiff that these drums were sent to Berlin & Farro for incineration.

Mr. VanHuis testified concerning the generation of a mixture of solvent and paint from defendant company's mask washer operation. *See* Depo. of David A. VanHuis, pp. 34–37. Specifically, he testified that waste solvent from the operation would be removed by pumping. *Id.* pp. 36–37. The material was "pretty well liquid at that point" and looked like "solvent, liquid with some color of paint." *Id.* pp. 37, 39. VanHuis also testified that during 1975, Approved only hauled a water and oil mixture from defendant Keeler Brass's diecasting operation and some solvent which could not be handled by another treatment facility. *Id.* p. 51. Furthermore, VanHuis testified to the effect that it would be an unusual situation that solids or sludges would be found in the drums, and that he was unaware of any instance where this had occurred. *Id.* p. 55. The Keller Brass employee stated that he did not see any residue in any of the drums that he handled. *Id.* pp. 55–56.

Without the testimony of plaintiff's expert witness and in light of the testimony of VanHuis recounted above, it is apparent that plaintiff has failed to raise a genuine issue of material fact relating either to the existence of any residual solids in defendant Keeler Brass's drums or that these drums were transhipped to the Forest Waste Site. Defendant, on the other hand, has satisfied its burden of demonstrating the absence of any triable issue. Accordingly, this Court will deny plaintiff's motion for partial summary judgment as to defendant Keeler Brass and grant certain defendants' motion for summary judgment as to this defendant.

### (8) DEFENDANT KNAPE & VOGT

Plaintiff has produced MDNR records purporting to show that 54 drums were transported by Knape & Vogt to Berlin & Farro during the time period in question. *See* Exh. 28 to Plaintiff's Brief. Plaintiff alleges that these drums contained spent cyanide-based stripping agent used to strip electroplated finishes from metal, citing the affidavit of Joseph Baweja, Jr., a former employee of defendant company. *See* Exh. 29 to Plaintiff's Brief.

Baweja testifies in his affidavit that the cyanide-based stripping agent was removed from tanks by pumping. *See* Aff. of Joseph Baweja, Jr. ¶ 7. The former Knape & Vogt employee attests that after all the liquids and some sludge were pumped out of the tanks, remaining material was manually removed from the tanks by scooping it out with 5–gallon buckets and by placing the material into 55–gallon drums. *Id.* ¶ 8. After the material was removed, according to Baweja, the tanks were washed down and all remaining liquids and residues were placed in 55–gallon drums. Defendant argues that there is no evidence to indicate whether the drums of "liquid waste" identified in the MDNR records consists of the pumped material or the scooped material. Significantly, according to defendant, both Charles Berlin and Norman Werchowsky attested in their affidavits that cyanide was incinerated at the Berlin & Farro Site. *See* Aff. of Charles Berlin ¶ 6; Aff. of Norman Werchowsky ¶ 9.

The Court finds that plaintiff has failed to show the exact nature of the wastes contained in defendant Knape & Vogt's drums shipped to the Berlin & Farro Site or that such drums contained residual solids after processing at the site. In fact, the evidence discussed above appears to indicate that defendant's cyanide-based waste was incinerated at Berlin & Farro. Plaintiff having failed to raise a genuine issue of material fact and defendant having met its burden of demonstrating the absence of any triable issue, the Court will deny plaintiff's motion for partial summary judgment as to defendant Knape & Vogt and grant certain defendants' motion for summary judgment as to this defendant.

### (9) DEFENDANT KNOLL INC./SHAW WALKER

Plaintiff has produced MDNR records purporting to show that 24 drums were

sent to Berlin & Farro by defendant Knoll Inc., now Shaw Walker (hereinafter "Knoll"). *See* Exh. 30 to Plaintiff's Brief. Plaintiff alleges that these drums contained waste cyanide with a high concentration of zinc. *See* Exh. 30–31 to Plaintiff's Brief.

Although defendants dispute the admissibility of the MDNR records, the Court will consider these records under the public records exception to the hearsay rule pursuant to Federal Rule of Evidence 803(8), as discussed *supra*. Defendant points out that even if it is assumed that these drums of cyanide waste were transported from Knoll to Berlin & Farro in 1975, plaintiff has produced no evidence to show that these drums were transhipped to the Forest Waste Site. In addition, defendant has put forth unrefuted affidavit testimony that special precautions were taken to ensure that cyanide wastes in particular were incinerated upon arrival at Berlin & Farro. *See* Aff. of Norman Werchowsky ¶ 9. Werchowsky, former co-owner of Approved, testified that when his company transported cyanide waste the company would notify Berlin & Farro that the load was on its way, that it contained cyanide, and that Berlin & Farro was required to incinerate it immediately upon receiving the waste. *Id.* The deposition testimony of Frank Farro, Berlin & Farro co-owner, supports the contention that any cyanide wastes brought to the site "would have [gone] through the incinerator." Depo. of Frank Farro, p. 72.

In light of the above, plaintiff has not submitted sufficient evidence to raise a genuine issue of triable fact. Moreover, plaintiff has offered no evidence that any of Knoll's drums containing cyanide waste was transhipped to the Forest Waste Site for disposal. The Court will therefore deny plaintiff's motion for partial summary judgment as to defendant Knoll and grant certain defendants' motion for summary judgment as to this defendant.

## (10) DEFENDANT MOTOR PRODUCTS–OWOSSO CORPORATION

Plaintiff has produced MDNR records purporting to show that 34 drums of waste were sent to Berlin & Farro by defendant Motor Products–Owosso Corporation ("Motor Products"). *See* Exh. 32 to Plaintiff's Brief. Plaintiff alleges that these drums contained coolant oils from the grinding and machining of steel. *See* Exhs. 32–33 to Plaintiff's Brief.

Defendant puts forward the affidavit of William F. Rulik, manager of manufacturing engineering at Motor Products during the time period in question. Rulik states that by-products of the grinding process employed by defendant company included a waste water stream known as "grinder water" or waste coolants and oils. *See* Aff. of William F. Rulik ¶ 6–7. This waste stream is comprised of water treated with soluble oil, minute quantities of metal shavings and grinding wheel particles. *Id.* ¶ 6. Rulik further testified that the 34 drums referred to by plaintiff would have been drums of "grinder water." Upon emptying a drum sent by defendant by decanting or pumping, the drum would contain at most a "film" of solid residue. *Id.* ¶ 12. As such, these drums would have been reclaimed and not sent to a landfill at any location. *Id.* ¶¶ 11 and 12; Farro Depo. pp. 30–31.

Plaintiff has not presented any evidence that defendant's drums were transhipped to the Forest Waste Site. The only evidence presented indicates that the contents of these drums were properly decanted and incinerated at Berlin & Farro. Accordingly, the Court finds that plaintiff has not submitted evidence sufficient to raise a genuine issue of triable fact. The Court will therefore deny plaintiff's motion for partial summary judgment as to defendant Motor Products and grant certain defendants' motion for summary judgment as to this defendant.

### (11) DEFENDANT PHARMACIA & UPJOHN

Plaintiff has produced MDNR records purporting to show that 19 drums of waste were sent to Berlin & Farro by defendant Pharmacia & Upjohn. *See* Exh. 38 to Plaintiff's Brief. Plaintiff alleges that these drums contained "polymers" generated during the production of colestipol hydrochloride. *See* Exh. 38 to Plaintiff's Brief.

Defendant Pharmacia & Upjohn has produced affidavit testimony from a number of witnesses indicating that the solvents contained in defendant's drums had high BTU values and were highly flammable. *See* Depo. of Charles Berlin, pp. 206–08; Aff. of Russell W. Coons, ¶ 9; Aff. of Edward J. Green, ¶ 8. In fact, the testimony indicates that the waste solvents were valued by Berlin & Farro as fuel for its incinerator. *See* Depo. of Charles Berlin, pp. 209–11. In opposition to plaintiff's produced MDNR records, defendant has put forward affidavit testimony that the solvents were always transported in bulk by tanker and not in drums. Michael Baldwin, former owner of Berlin & Farro, testifies that he was not familiar with any instance where anything that was transported by Approved was ever sent to the Forest Waste Site, either directly or indirectly. *See* Depo. of Michael Baldwin, p. 55. Ronald L. Jackson, an employee of Berlin & Farro during the time period in question, also testified that he did not recall any solids that were brought in by Approved. Depo. of Ronald L. Jackson, p. 50.[9]

The evidence presented shows that defendant Pharmacia and Upjohn's waste was transported to Berlin & Farro by Approved and that all these wastes were incinerated at that site. There has been no evidence submitted showing that these wastes were not incinerated or that any wastes brought by Approved to Berlin & Farro were subsequently transhipped to the Forest Waste Site. Accordingly, the Court finds that plaintiff has failed to raise a triable issue with respect to this defendant. Defendant Pharmacia and Upjohn has satisfied its burden on demonstrating the absence of any genuine issues of material fact. As a result, the Court will deny plaintiff's motion for partial summary judgment as to defendant Pharmacia and Upjohn and grant certain defendants' motion for summary judgment as to this defendant.

### (12) DEFENDANT ROWE INTERNATIONAL

Plaintiff has produced MDNR records purporting to show that 17 drums of waste were sent to Berlin & Farro by defendant Rowe International ("Rowe"). *See* Exh. 34 to Plaintiff's Brief. Plaintiff alleges that these drums contained waste paint, paint sludge and chrome. *See* Exh. 34–35 to Plaintiff's Brief.

Defendant initially contests the admissibility of the MDNR records. As previously discussed, the Court will consider these records pursuant to the public records exception to the hearsay rule. *See* Fed. R.Evid. 803(8). Defendant argues that assuming Rowe's drummed waste was sent to Berlin & Farro during the time period in question, there is no dispute that the waste would have been transported by Approved. The unrefuted testimony submitted by defendant shows that any drums brought to the Berlin & Farro Site were immediately emptied into the burn tanks and that empty drums were put into a recycle pile to be picked up by a drum reclaimer. Baldwin Depo. pp. 55–57. Moreover, Baldwin testified that he is not familiar with any drums that ever came in from Approved which were then transport-

---

9. Defendant also relies upon the affidavit testimony of Dr. Dae Yang Cha, relating to the processes used to manufacture colestipol hydrochloride resulting in the production of waste polymers. Dr. Cha's testimony is presented to rebut the testimony of plaintiff's proposed expert Eugene Meyer. Since the Court has already excluded Meyer's testimony as scientifically unreliable under *Daubert*, the Court will not now enter into a discussion of Dr. Cha's rebuttal testimony.

ed to the Forest Waste Site. *Id.* pp. 56–57. According to Frank Farro, the wastes that came in from Approved were always incinerated and, in his experience, any waste paints would have been incinerated at the Berlin & Farro Site. *See* Farro Depo. pp. 46 and 47. Charles Berlin similarly testified that the material brought in by Approved was good material for incinerating and of a consistent quality. Aff. of Charles Berlin ¶ 5. Finally, and as quoted above, Ronald Jackson, an employee of Berlin & Farro during the time period in question, stated that "Approved brought drums [to Berlin & Farro] that were good, nothing but liquid [so] that the drums would in fact empty out wholly." Depo. of Ronald L. Jackson, pp. 36–37.[10]

As with the other certain defendant discussed above, plaintiff has failed to show any causal connection between the waste allegedly transported to Berlin & Farro and the waste found at the Forest Waste Site. Moreover, defendant Rowe has proffered unrebutted testimony which indicates that waste that was sent to Berlin & Farro via Approved was immediately processed and incinerated. Consequently, defendant Rowe has met its burden of demonstrating the absence of any genuine triable issues of fact. As with the other certain defendants, this Court will deny plaintiff's motion for partial summary judgment as it relates to defendant Rowe and grant certain defendants' motion for summary judgment as to defendant Rowe.

## (13) DEFENDANT U.S. CHEMICAL

As mentioned previously, defendant U.S. Chemical joined in certain defendants' response to plaintiff's motion for partial summary judgment. Notice of such joinder

was filed by U.S. Chemical on January 29, 1999. Despite the fact that it has joined in certain defendants' response, defendant U.S. Chemical has *not* joined in certain defendants' cross-motion for summary judgment. Nor has defendant U.S. Chemical presented any evidence on its own behalf rebutting the plaintiff's contentions set forth in plaintiff's motion for partial summary judgment.

■ The Court finds that plaintiff has satisfied its burden of establishing the absence of all genuine issues of material fact with respect to defendant U.S. Chemical. The record is replete with credible testimony that the materials from "U.S. Chemical ... [as well as from] Stauffer Chemical, [and] Chemical Recovery usually all had solids or sludges in that [they] did not dump clean." Depo. of Ronald L. Jackson, pp. 36–37; *see also* Baldwin Depo., pp. 43, 55–57; Farro Depo. 46; Werchowsky Aff. ¶ 4; Berlin Aff. ¶¶ 4–11. Defendant U.S. Chemical has not presented any evidence to dispute this testimony. *See also* Plaintiff's Brief in Support of Motion for Partial Summary Judgment, p. 13 (alleging that U.S. Chemical arranged for disposal of 2,808 drums of waste at Berlin & Farro, citing Plaintiff's Exh. 36).

Because defendant U.S. Chemical has failed to "set forth specific facts showing a genuine triable issue," the Court finds that this defendant has failed to meet its shifted burden under Federal Rule of Civil Procedure 56. Accordingly, the Court will grant plaintiff's motion for partial summary judgment as to this defendant. It should be emphasized that this ruling only disposes of the issue of liability. A further determination as to damages must still be assessed at trial.

10. Defendant raises a further alternative argument that even assuming arguendo that the some or all of the 17 drums sent by defendant Rowe to Berlin & Farro contained sludges or sediments that did not readily pour out, the probative evidence shows that it is more likely that such drums were landfilled on site at Berlin & Farro rather than transhipped to Forest Waste Site. *See* Joint Exh. E. The U.S. EPA estimated that over 33,000 drums containing liquids, sludges and solids were bur-

ied on-site at Berlin & Farro. MDNR also found a paint sludge trench occupying 0.2 acres of the Berlin & Farro Site as well as seven other areas which contained sludges, solvents, drums, and drum fragments. *See id.* Plaintiff has offered no evidence which shows that even if Rowe's drums containing waste paints and sludge were transported to Berlin & Farro, that those drums would not have been disposed on-site at Berlin & Farro, assuming they were not reclaimed.

#### 4. CONCLUDING REMARKS

Plaintiff brought the instant motion for partial summary judgment against 15 defendants. Twelve of these defendants have responded as a group. The Court has concluded that all twelve of these responding defendants shall have summary judgment granted in their favor for the reasons set forth above. As discussed, partial summary judgment shall be granted against defendant U.S. Chemical.

There are, however, two defendants still remaining who did not join in the group response: (1) B–B Paint Corporation and (2) Chemical Recovery Systems.

With respect to B–B Paint Corporation, it has filed its own motion for summary judgment which this Court shall treat as this defendant's response to plaintiff's motion for partial summary judgment. Defendant B–B Paint Corporation's motion is discussed, *infra*.

With respect to defendant Chemical Recovery Systems, the parties stipulated at the hearing held May 18, 1999 that this defendant had "defaulted," although no formal default judgment has been entered. After duly reviewing the official docket in the instant case, the Court finds that defendant Chemical Recovery Systems has indeed failed to respond in any way to plaintiff's motion for partial summary judgment. The Court will therefore grant plaintiff's motion for partial summary judgment as to defendant Chemical Recovery Systems. As with defendant U.S. Chemical, a further determination as to the damages to be assessed will be made at trial.

#### VI. MOTIONS 5 AND 6: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT WILLIAM GREENWAY *AND* DEFENDANT WILLIAM GREENWAY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On January 29, 1999, plaintiff filed a motion for partial summary judgment against defendant William Greenway, in his individual capacity. On March 19, 1999, defendant Greenway filed his brief in opposition to plaintiff's motion for partial summary judgment. On February 16, 1999, defendant Greenway filed a cross motion for partial summary judgment against plaintiff, to which plaintiff responded on March 18, 1999. On April 8, 1999, plaintiff filed a reply brief in support of its motion for partial summary judgment. Finally, on April 9, 1999, defendant filed a reply brief in support of his motion for partial summary judgment.

For the reasons set forth below, this Court will deny plaintiff's motion for partial summary judgment against defendant Greenway and grant defendant Greenway's motion for partial summary judgment against plaintiff.

#### A. ANALYSIS

Applying the standards for evaluating motions for summary judgment contained within Federal Rule of Civil Procedure 56, as discussed *supra*, this Court must determine whether either party has satisfied the requirement of demonstrating the absence of all genuine issues of material fact as to defendant Greenway's liability for clean-up costs at the Forest Waste Site. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986).

Plaintiff argues that defendant William Greenway, the only individual defendant remaining in the above-captioned case, is liable for the drummed waste allegedly generated by U.S. Chemical and ultimately transhipped to the Forest Waste Site. Since partial summary judgment has been granted against defendant U.S. Chemical, this Court will assume for purposes of the instant motion that U.S. Chemical is liable to plaintiff for some amount of cleanup costs incurred. The question thus becomes whether plaintiff may "pierce the corporate veil" in order to impose personal

liability on defendant Greenway, a corporate officer of U.S. Chemical.

CERCLA does provide for so-called "arranger liability" in situations where "any person who by contract, agreement, or otherwise arranged for disposal ... or arranged with a transporter for transport for disposal ... of hazardous substances owned or possessed by such person" shall be liable. 42 U.S.C. § 9607(a)(3).[11] Plaintiff cites an Eighth Circuit decision construing this CERCLA provision as imposing direct arranger liability on an officer of the corporation even though the hazardous substances were generated and owned by the corporation. *See U.S. v. TIC Investment Corp.*, 68 F.3d 1082, 1089 (8th Cir. 1995), *cert. denied sub. nom. Georgoulis v. U.S.*, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996) (holding that direct arranger liability under CERCLA may be imposed against corporate officer or director if, under totality of circumstances, he or she had authority to control and did in fact exercise actual or substantial control, directly or indirectly, over arrangement for disposal, or for off-site disposal, of hazardous substances); *see also Nutrasweet Co. v. X-L Eng'g Corp.*, 933 F.Supp. 1409 (N.D.Ill.1996).

Defendant Greenway argues that the Eighth Circuit's decision in *TIC* is factually distinguishable from the case at hand, and at any rate is not controlling precedent. In *TIC*, the appellate court held that "a finding of arranger liability requires some level of actual participation in, or exercise of control over, activities that are causally connected to, or have some nexus with, the arrangement for disposal of hazardous substances or the off-site disposal itself." *TIC*, 68 F.3d at 1087–88. In that case, the court noted that the undisputed facts revealed that "[defendant] did not simply delegate authority and rely on the judgment of others; as a practical matter, his mandates

left no room for others to exercise any decision making authority or judgment in any area of the business, including hazardous waste disposal." *Id.* at 1089. Furthermore, defendant's actions "inexorably led to the continuation of the disposal of [the corporation's] wastes at the dumpsite." *Id.* at 1090. The court stressed that it based its conclusions on "a fact-intensive examination of the totality of the circumstances." *Id.*

Most significantly, the Sixth Circuit has recently set forth rules concerning arranger liability in *Carter–Jones Lumber Co. v. Dixie Distributing Co.*, 166 F.3d 840 (6th Cir.1999). In that case, the court held that "[t]he requisite inquiry for those who may have 'otherwise arranged' is 'whether the party intended to enter into a transaction that included an "arrangement for" disposal of hazardous substances. The intent need not be proven by direct evidence, but can be inferred from the totality of the circumstances' " *Id.* at 845 (citing *United States v. Cello–Foil Prods., Inc.*, 100 F.3d 1227, 1231 (6th Cir.1996)). The Sixth Circuit affirmed the district court's conclusion in *Carter–Jones* that an individual, the defendant, could be held liable under CERCLA as an arranger for disposal of hazardous waste because Ohio state law allowed for the piercing of the corporate veil. The Court further found that defendant was also liable in his own right due to his "intimate participation" in the arrangement for disposal. *Id.* at 846–47.

In the instant case, plaintiff has admitted that (1) it has no evidence that Greenway ever visited the Berlin and Farro Site, (2) it has no evidence that Greenway ever visited the Forest Waste Site, (3) it has no evidence that Greenway directed anyone to dispose of drums at the Forest Waste Site, (4) it has no information regarding the relationship between Greenway and Berlin & Farro concerning the transhipment of drums to the Forest Waste Site, and (5) it

**11.** The Michigan Natural Resources and Environmental Protection Act, M.C.L. § 324.20126(1)(d), contains a substantially similar provision allowing for arranger liability.

has no information as to who actually made the decision to tranship the drums to the Forest Waste Site. *See* Defendant's Brief in Support of Motion for Partial Summary Judgement, p. 4 (citing Exh. 2).

Defendant has put forward deposition testimony of Carl Baldwin, who was employed by Berlin & Farro as a truck driver. Baldwin testified that he had never heard of Greenway and that he has no information that "Greenway was directly involved in any way in the disposal of anything at the Forest Waste Site...." *See* Depo. of Carl Baldwin, attached as Exh. 4, p. 82. In addition, defendant points to plaintiff's witness Stephanie Gordinier who testified that there is no direct evidence linking any specific defendant's waste to the Forest Waste Site. *See* Depo. of Stephanie Gordinier, attached as Exh. 5, pp. 111–12; 169–70. Gordinier further testified that she is not aware of any evidence linking defendant Greenway personally with the Forest Waste Site. *See id.* p. 167; see also Depo. of Frank Farro, attached as Exh. 6, pp. 74–75.

■ Applying the Sixth Circuit's latest ruling for imposition of arranger liability under CERCLA, 42 U.S.C. § 9607(a)(3), this Court finds that defendant Greenway did not "arrange" for disposal of hazardous waste on behalf of U.S. Chemical at the Forest Waste Site. It is clear from the testimony presented that defendant Greenway had *no role* in arranging the alleged transhipment of drums from Berlin & Farro to the Forest Waste Site. His role in the instant case is distinguishable from the roles of the defendants in *Carter–Jones* and *TIC.* Unlike those defendants, Greenway had no "intimate participation" in the alleged disposal at the Forest Waste Site. Because of this lack of participation and lack of knowledge regarding the transhipment, it cannot be said that defendant Greenway "intended to enter into a transaction that included an 'arrangement for' disposal of hazardous substances" at the ultimate site for which liability is sought to be imposed, i.e., the Forest Waste Site.

In light of the foregoing considerations, this Court finds that plaintiff has failed to raise a genuine issue of material fact concerning defendant Greenway's personal liability for any waste of U.S. Chemical allegedly disposed of at the Forest Waste Site. As plaintiff admits, there is no evidence linking Greenway to the Forest Waste Site. Defendant Greenway has satisfied his burden of demonstrating the absence of any triable issues of fact. As a result, plaintiff's motion for partial summary judgment will be denied and defendant Greenway's cross motion for partial summary judgment will be granted.

## VII. MOTION 7: DEFENDANT B–B PAINT CORPORATION'S MOTION FOR SUMMARY JUDGMENT

The final motion currently pending in the above-entitled case is defendant B–B Paint Corporation's motion for summary judgment filed February 1, 1999. The instant motion is also intended as defendant B–B Paint Corporation's response to plaintiff's motion for partial summary judgment. Plaintiff filed a response to the instant motion on March 18, 1999. Defendant filed its reply brief on April 8, 1999.

For the reasons set forth below, the Court will deny plaintiff's motion for partial summary judgment against defendant B–B Paint Corporation and grant defendant B–B Paint Corporation's motion for summary judgment.

### A. ANALYSIS

Defendant B–B Paint argues against the imposition of strict liability and in favor of the application of a causation requirement. As discussed at length above, this Court is bound by the Sixth Circuit's recent pronouncements concerning causation in *Kalamazoo River Study Group v. Rockwell Int'l Corp.,* 171 F.3d 1065 (6th Cir. 1999). In that case, the court held that "[i]n a 'two-site' case ... where hazardous substances are released at one site and

allegedly travel to a second site, in order to make out a prima facie case, the plaintiff must establish a causal connection between the defendant's release of hazardous substances and the plaintiff's response costs incurred in cleaning them up." *Id.* at 1068. Since this case is such a "two-site" case, plaintiff will be required to "proffer evidence sufficient to support a finding that hazardous substances traceable to the defendant are in nature, quantity, and durability sufficient [to impose liability]." *Kalamazoo River Study Group v. Rockwell Int'l,* 3 F.Supp.2d 799, 806 (W.D.Mich. 1998) (citing *Acushnet Co. v. Coaters, Inc.* ("*Acushnet II*"), 948 F.Supp. 128, 136 (D.Mass.1996)).

As with the other remaining defendants, plaintiff has produced MDNR records purporting to show that a number of drums of waste, 43 total, were sent to Berlin & Farro by defendant B–B Paint Corporation (hereinafter "B–B Paint") during the period January 1, 1975 through July 19, 1975. *See* Exh. 8 to Plaintiff's Brief. Plaintiff alleges that these drums contained scrap paint made up of 75% solvents, 15% resins, 5% pigments, and 5% water. *See* Exhs. 8–9 to Plaintiff's Brief. For the composition of the waste, plaintiff relies on a letter dated April 1, 1983 from defendant B–B paint to the United States EPA, attached as Exhibit 8 to plaintiff's brief. Plaintiff also relies heavily on the conclusions set forth in the affidavit of proposed expert Meyer. However, for the reasons discussed above, this Court has ruled Meyer's testimony inadmissible under *Daubert.*

Defendant points out that plaintiff has been unable to produce any evidence tending to show that any waste from B–B Paint was ever deposited at the Forest Waste Site. Furthermore, defendant has presented deposition testimony confirming that the identities of the companies who had supplied the drums to Berlin & Farro which were subsequently transhipped to the Forest Waste Site are unknown. *See* Depo. of Ronald L. Jackson, p. 67; *see also* Depo. of Michael Carl Baldwin, p. 86. Defendant argues that of the 43 drums of waste sent to Berlin & Farro, there is no reason to believe that any of these drums were transhipped to the Forest Waste Site. According to defendant, if any of the drums did leave Berlin & Farro, they might have been transported to a drum recycler or to other waste sites.

The Court finds that without the testimony of its proposed expert, plaintiff is unable to produce any evidence that any residue remained in the drums sent by defendant to Berlin & Farro making them unattractive candidates for recycling. As a consequence, plaintiff has failed to show that "it is more likely than not" that B–B Paint "sent identifiable hazardous wastes" to the Forest Waste Site. *See Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1497–98 (N.D.Ind.1994). It is not sufficient that defendant's waste "could have" or "might have" been the waste which was transhipped to the Forest Waste Site. *Id.*

Accordingly, plaintiff having failed to satisfy its burden of raising a triable issue of material fact and defendant having met its burden of demonstrating the absence of any genuine issues of fact necessitating a trial, this Court will deny plaintiff's motion for partial summary judgment as it relates to defendant B–B Paint Corporation and grant defendant B–B Paint Corporation's motion for summary judgment.

### ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED that certain defendants' motion to exclude expert opinions of Eugene Meyer is **GRANTED;**

IT IS FURTHER ORDERED that defendant Pharmacia & Upjohn Company's motion to disqualify Eugene Meyer, Ph.D. from testifying against defendant Pharmacia & Upjohn Company is **DENIED AS MOOT;**

IT IS FURTHER ORDERED that plaintiff's motion for partial summary

judgment is **DENIED** with respect to the following *thirteen* responding defendants, (1) Bradford White Corporation, (2) Brunswick Corporation, (3) Chemetron Corporation, (4) Ciba Specialty Chemicals Corporation, (5) Eagle Ottowa Leather Company, (6) International Harvester/Navistar, (7) Keeler Brass Company, (8) Knape & Vogt Manufacturing Company, Inc., (9) Knoll, Inc./Shaw Walker, (10) Motor Products–Owosso Corporation, (11) Pharmacia & Upjohn, (12) Rowe International and (13) B–B Paint Corporation, and **GRANTED** with respect to defendants Chemical Recovery Systems and U.S. Chemical;

**IT IS FURTHER ORDERED** that certain defendants' cross motion for summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment against defendant William Greenway is **DENIED**;

**IT IS FURTHER ORDERED** that defendant William Greenway's motion for partial summary judgment is **GRANTED**;

**IT IS FURTHER ORDERED** that defendant B–B Paint Corporation's motion for summary judgment is **GRANTED**.

**SO ORDERED.**